Complainant seeks an accounting for royalties on patents for inventions used in sales recording devices manufactured by defendant. Some of the inventions were made by him individually and some were made by him and Walter C. Shoup, at that time the president of defendant, as joint inventors. Complainant bases his claim on two contracts between him and defendant, one made on the 23d day of May, 1923, and the other the 2d day of January, 1924.
The first contract, that of May 23d 1923, recites that whereas complainant, either alone or as joint inventor with Walter C. Shoup, has made certain inventions relating to autographic registers, and whereas complainant had been in the employ of the company and had been paid royalties for the use of said inventions during the previous year, and whereas defendant wished to acquire said inventions and any further inventions and improvements thereon, and to secure the services of complainant, the defendant agreed to *Page 73 
employ him at a salary of $4,000 per annum which could be changed by mutual agreement, and also to pay royalties during the life of any patent previously or which thereafter might be granted on said inventions, a certain royalty payable on each of certain specified models of autographic registers. The contract contains a provision whereby complainant assigned all his inventions heretofore made and agreed to assign any further inventions that he might make under the contract. The contract provided for termination of complainant's employment upon three months' notice by either party, but expressly provided that payment of royalties should continue during the life of the patents granted on the inventions.
Walter C. Shoup, the active head of the defendant, died in 1923 and was succeeded as president by his widow who, on the 2d day of January, 1924, executed another contract with complainant which expressly ratified and confirmed the first contract, except as it was modified by the second one. These modifications increased the salary of complainant to $6,000, and also contained a provision for payments to be made to complainant in case defendant licensed others to use the inventions.
Mrs. Shoup in turn was succeeded as president by her brother, James L. Dowsey. Friction developed between Mr. Dowsey and complainant, and in June, 1925, complainant, at the suggestion of Mr. Dowsey, tendered his resignation as of July 7th, 1925, and it was accepted.
Defendant continued to pay royalties to complainant after he ceased his employment, the check therefor being paid to complainant in February, 1926, on registers sold in 1925. Complainant at the time contended that the sum paid was insufficient since the statements delivered to him did not cover all types of register. A lengthy correspondence ensued respecting the interpretations to be given the contracts, which ended when defendant finally took the position that nothing was due complainant. Complainant thereafter brought this suit.
Defendant now asserts that defendant is not bound by *Page 74 
the terms of the two contracts so far as the provisions for royalties are concerned, first, because so far as the inventions made prior to the contract are concerned, complainant had already executed assignments of them to defendant. Second, that all these inventions made by complainant while employed by defendant, belonged to defendant, and third, that the contracts between complainant and defendant were made by officers of defendant who had no authority to make them.
I do not consider any of these defenses as sound. The first one is based on the theory that the contract contained a provision which bound complainant to assign his inventions to defendant. In fact, he had already assigned his inventions made up to that time and therefore defendant contends there was no consideration for an agreement to pay royalties thereon. While it is true that the original inventions made prior to the contract had been assigned, yet it would appear from the first contract itself that there was an agreement to compensate complainant therefor, since the contract itself recites the fact that during the prior year the sum of $2,134 had been paid to complainant as royalty. In this aspect it is clear that the contract really embodied or made definite an already existing obligation on the part of defendant to complainant. Furthermore, this argument is of no validity as to inventions made by complainant after the date of the contract. In fact, complainant did make further inventions and did actually assign at least one of them to defendant after cessation of his employment.
As to the second contention, while it is true that inventions made by an employe in connection with his employment belong to the employer, this does not necessarily bar the employe from receiving extra compensation therefor by agreement with the employer. There is nothing to prevent the making of a contract whereby the compensation of the employe may be measured by payments of royalty based on the number of devices manufactured embodying his inventions.
The present contract provided for a salary, plus a payment of royalties. It may well have been, and almost certainly was, an inducement to complainant to continue to *Page 75 
work for defendant and to make other and further inventions; that he was to receive an additional compensation measured by the number of his devices used. Had his compensation been limited to the $4,000 stipulated in the contract as salary, it is highly probable that he would have terminated his employment. The incentive of the additional payments certainly added consideration for the agreement by defendant to pay him additional royalties. Nor is there any reason why such royalties should cease upon the termination of the employment itself. The defendant retained the benefit of all the inventions, and complainant, so long as he remained in defendant's employ, was precluded from making or marketing inventions elsewhere.
The third contention is, in substance, to the effect that the contract was made by the president without express authority from the board of directors and that under the by-laws such a contract was ultra vires and void. Under the by-laws, the president was expressly authorized to make contracts of employment, and as I interpret the contracts in suit, he was authorized to make such a contract as this. In addition, complainant was for years employed by defendant, his dealings being with Walter C. Shoup, the president. Until a considerable time after complainant left his employment, the contract was in fact recognized as being binding and valid and was carried into effect by both parties. Royalties had been paid to complainant in accordance with some prior agreement with him respecting royalties and royalties continued to be paid up to and including part of the year after complainant left defendant. No question was ever raised by anyone concerning the power or authority of the officers signing the contracts who, it would appear, were actually in full control of the corporation, and even if there was some excess of authority by the president in executing the contract, long and complete acquiescence in its terms must be deemed to be sufficient ratification by the corporation itself. The claim that the president exceeded his authority seems to be a mere afterthought for the first time considered as affecting the validity of the contract only long after the *Page 76 
parties had entered into a dispute as to the interpretation of its terms. The contract was unquestioned, was carried out on both sides for a period of at least four years in each of which royalties were paid to complainant.
A decree will be advised granting to complainant an accounting as prayed for.